[610 NYS2d 341]

In the Matter of COMMONWEALTH OF MASSACHUSETTS et al., Petitioners, v NEW YORK STATE BOARD ON ELECTRIC GENERATION SITING AND THE ENVIRONMENT et al., Respondents. (Proceeding No. 1.)

In the Matter of CONCERNED CITIZENS FOR THE ENVIRONMENT, INC., Petitioner, v NEW YORK STATE BOARD ON ELECTRIC GENERATION SITING AND THE ENVIRONMENT et al., Respondents. (Proceeding No. 2.)

Third Department, April 14, 1994

## APPEARANCES OF COUNSEL

*Scott Harshbarger, Attorney General,* Boston, Massachusetts

*(Matthew Brock* of counsel), for Commonwealth of Massachusetts, petitioner.

*Jeffrey L. Amestoy, Attorney General,* Montpelier, Vermont *(J. Wallace Malley, Jr.,* of counsel), for State of Vermont, petitioner.

*Bernstein, Cushner & Kimmell, P. C.,* Boston, Massachusetts *(Jeffrey M. Bernstein* of counsel), for Sierra Club, Inc., petitioner.

*Kenneth G. Dufty,* Schaghticoke, Concerned Citizens for the Environment, Inc., petitioner *pro se.*

*Twomey, Latham, Shea & Kelley,* Riverhead *(John F. Shea, III,* of counsel), for petitioners.

*William J. Cowan,* Albany *(Jonathan D. Feinberg* of counsel), for New York State Board on Electric Generation Siting and the Environment, respondent.

*Cohen, Dax, Koenig & Wiles, P. C.,* Albany *(Jeffrey C. Cohen, John W. Dax, Ben Wiles* and *Richard B. Miller* of counsel), for Inter-Power of New York, Inc., respondent.

### OPINION OF THE COURT

CREW III, J.

In October 1988, respondent Inter-Power of New York, Inc. filed an application with respondent New York State Board on Electric Generation Siting and the Environment (hereinafter the Siting Board), pursuant to Public Service Law former article VIII,[1] for a certificate of environmental compatibility and public need to construct a 210-megawatt coal-fired cogeneration facility (hereinafter the project or the facility) in the Town of Halfmoon, Saratoga County. The application in-

---

1. In 1972, the Legislature enacted Public Service Law former article VIII, which established the Siting Board and created a uniform procedure for decisionmaking concerning the siting and approval of major steam electric generating facilities in the State *(see,* L 1972, ch 385; *see also, Consolidated Edison Co. v Town of Red Hook,* 60 NY2d 99, 103; *Koch v Dyson,* 85 AD2d 346, 358-359). This initial enactment of Public Service Law former article VIII was to expire on January 1, 1979 *(see,* L 1972, ch 385, § 8), and in 1978 the Legislature reenacted Public Service Law former article VIII, which was set to expire again on January 1, 1989 *(see,* L 1978, ch 708, § 4, as amended by L 1983, ch 721, § 2). Public Service Law former article VIII remains in effect, however, in those instances where, as here, the application in question was filed on or before December 31, 1988 *(see, ibid.).*

cluded, *inter alia,* a power sales contract entered into by Inter-Power and Niagara Mohawk Power Corporation, an electrical utility and would-be purchaser of the power to be generated by the proposed facility. The contract was entered into in 1988 pursuant to an order issued by the Public Service Commission (hereinafter PSC) and required, *inter alia,* that the facility be operational by December 31, 1993. Inter-Power's application also included a brief description and analysis of the possible alternatives to the proposed project.

Inter-Power's application was deemed complete on March 29, 1989 and a series of public hearings followed. Ultimately, in March 1991, the Administrative Law Judge (hereinafter ALJ) who presided over the hearings issued a recommended decision, wherein he concluded that a natural gas-fired facility was preferable to a coal-fired facility and, therefore, recommended that the proposed facility not be certified. In May 1991, the Siting Board voted 5 to 2 to approve Inter-Power's application but thereafter rescinded its decision due to, *inter alia,* the Department of Environmental Conservation's discovery of certain errors in the base line inventory of emission sources that Inter-Power had utilized in modeling the air quality studies for the project. The Siting Board then ordered additional hearings on air quality issues and Inter-Power was permitted to submit, over petitioners' objections, additional air quality analyses. Additionally, the Siting Board removed the ALJ who had presided over the initial hearings and replaced him with another ALJ.

While these additional hearings were pending, it became apparent that Inter-Power was not going to be able to meet the December 31, 1993 in-service deadline imposed under its 1988 contract with Niagara Mohawk, and petitioners requested a hearing on, *inter alia,* how this would impact Inter-Power's application. The Siting Board denied this request but, *inter alia,* permitted the parties to brief this issue at a later date. The Siting Board thereafter voted to approve Inter-Power's application and, by decision and order dated September 24, 1992, granted Inter-Power the requested certificate pursuant to Public Service Law former article VIII. The certificate was subject to a number of conditions, however, including Inter-Power's ability to obtain a power sales contract on or before December 31, 1992. The Siting Board's decision further provided that it would leave to the PSC the review and resolution of any outstanding contract issues.

Thereafter, the Siting Board granted Inter-Power's numer-

ous requests for additional time in which to obtain a power sales contract, ultimately imposing a deadline of March 12, 1993. When it became apparent that Inter-Power again would be unable to meet the required deadline, the Siting Board decided to "shelve" the certificate. Under the terms of the Siting Board's decision, the certificate would lapse on September 13, 1994 unless Inter-Power could, *inter alia,* obtain a revised power sales contract, justify the contract prices and demonstrate that the health and environmental impacts identified in previous studies had not changed materially since March 12, 1993. Petitioners' subsequent request for a rehearing was denied.

Petitioners Commonwealth of Massachusetts, State of Vermont and Sierra Club, Inc. thereafter commenced a proceeding in this Court (proceeding No. 1) pursuant to Public Service Law former § 148 to challenge the Siting Board's grant of a certificate to Inter-Power, and petitioner Concerned Citizens for the Environment, Inc. commenced a separate proceeding (proceeding No. 2) seeking similar relief. The Siting Board's subsequent application for a stay of these proceedings until it was determined whether Inter-Power would be able to obtain a contract within the requisite period of time was denied by this Court.

Although petitioners have challenged the Siting Board's determination on a number of substantive and procedural grounds, petitioners' arguments essentially distill to whether the Siting Board properly discharged the statutory duties imposed upon it by Public Service Law former article VIII. As such, before we address the specific challenges raised by petitioners, a brief review of the relevant statutory provisions is in order.

Public Service Law former article VIII has been characterized as a "one-stop certification" statute (Governor's Mem, 1978 McKinney's Session Laws of NY, at 1838) and was designed to "provide for the expeditious resolution of all matters concerning the location of major steam electric generating facilities [within the State] in a single proceeding" (L 1972, ch 385, § 1). Under the terms of Public Service Law former article VIII, a developer seeking a certificate of environmental compatibility and public need must first submit to the Siting Board an application containing, *inter alia,* a description of the proposed site and facility *(see,* Public Service Law former § 142 [1] [a]), a description of alternate practical sources of power to the proposed facility, together with a

description of the comparative advantages and disadvantages of each source (see, Public Service Law former § 142 [1] [b]), estimated cost information, including the total generating cost per kilowatt-hour (see, Public Service Law former § 142 [1] [d]), and a statement explaining the need for the facility (see, Public Service Law former § 142 [1] [e]). The application must also include a $150,000 fee to be used to establish a fund to defray expenses incurred by municipal and other local parties to the proceeding (see, Public Service Law former § 142 [6]).

Once the Chair of the Siting Board determines that the application is complete, public hearings are scheduled before a presiding and associate ALJ who, at the conclusion of the hearing, issue a recommended decision (see, Public Service Law former §§ 143, 145). The Siting Board then reviews the record and renders a decision either granting or denying the application in question (see, Public Service Law former § 146 [1], [2]). Before the Siting Board may grant the requested certificate, it must first "find and determine" several factors including, inter alia, (1) the public need for the facility, (2) the nature of the probable environmental impact of the facility, (3) that the facility represents the minimum adverse environmental impact and is compatible with the public health and safety, (4) that the facility is consistent with the long-range planning objectives for electric power in the State, and (5) that the facility is in the public interest (see, Public Service Law former § 146 [2] [a]-[g]). Assuming the statutory criteria have been satisfied, the Siting Board may issue a certificate authorizing construction of the proposed facility.

▮ We now turn to the specific arguments advanced by petitioners. As a threshold matter, we must determine whether the Siting Board lost jurisdiction over Inter-Power's application by extending the certification process beyond the two-year deadline set forth in Public Service Law former § 143 (4).[2] Although this two-year period has been construed as directory and not mandatory, the Siting Board will be deemed

---

2. The statute requires that proceedings under Public Service Law former article VIII, including the Siting Board's issuance of its final decision, be completed within two years of the date the underlying application is deemed complete. The Siting Board may, however, waive the two-year deadline "in order to give consideration to specific issues necessary to develop an adequate record" (Public Service Law former § 143 [4]). Here, the record indicates that although the Siting Board exceeded the two-year deadline, it did so in order to fully develop the record with respect to the project's economic and environmental impacts, and we therefore reject petitioners' assertion that the Siting Board lost jurisdiction over Inter-

to have lost jurisdiction over Inter-Power's application upon a showing of substantial prejudice to petitioners *(see, Matter of County of Suffolk v Gioia,* 96 AD2d 220, 224-225; *cf., Matter of Sarkisian Bros. v State Div. of Human Rights,* 48 NY2d 816, 818).

Petitioners' argument on this point is two-fold. First, petitioners contend that they were prejudiced by the Siting Board's decision to grant Inter-Power additional time to amend or correct its initial application and to submit additional air quality studies. Although responding to the changes in Inter-Power's application and reviewing the revised air quality studies was no doubt costly and time-consuming, the record indicates that petitioners had the opportunity to and did indeed challenge Inter-Power's submissions in this regard, and we are therefore unable to conclude that petitioners were substantially prejudiced by this precertification delay. Nor are we persuaded that the Siting Board's handling of this matter after the project was conditionally certified operated to divest it of jurisdiction. Assuming, for purposes of this discussion, that the conditional certificate issued is otherwise valid, we note that although the postcertification delay has been rather lengthy, and the administrative proceeding as a whole arguably less than expeditious, Inter-Power has not been granted an indefinite extension *(cf., Matter of County of Suffolk v Gioia, supra).* The conditional certificate will lapse by its own terms in September 1994 if the outstanding economic issues are not resolved before then. Additionally, although the filing of a revised power sales contract and the passage of additional time may trigger the need for further hearings on project economics and environmental impacts, the need for such hearings is uncertain at this point, and we are therefore unable to conclude, based upon the record presently before us, that petitioners have suffered substantial prejudice. In the event a revised power sales contract is filed before the conditional certificate lapses and the need for additional hearings is demonstrated, it may well be that the scope and cost of such hearings, together with the additional delay occasioned by them, will result in substantial prejudice to petitioners. Unless these events come to pass, however, petitioners' claim of prejudice is speculative and, in our view, premature.[3]

---

Power's application merely by extending the administrative process past the two-year mark.

   **3.** [2] For similar reasons, we reject petitioners' assertion that the Siting

■ Having concluded that the Siting Board has not lost jurisdiction over Inter-Power's application, the issue then becomes whether the Siting Board's decision to grant the conditional certificate was proper. In this regard, we note that our scope of review is limited to, *inter alia,* whether the Siting Board's determination is (1) supported by substantial evidence in the record, (2) within the Siting Board's statutory jurisdiction or authority, (3) made in accordance with Public Service Law former article VIII and the applicable rules and regulations, and (4) arbitrary, capricious or an abuse of discretion *(see,* Public Service Law former § 148 [2] [a]-[e]).

Petitioners' primary contention regarding the substance of the Siting Board's determination is that the Siting Board failed to properly discharge the duties imposed upon it by Public Service Law former article VIII prior to granting the conditional certificate. Specifically, petitioners argue that absent a valid power sales contract, the Siting Board could not properly review the economics of the proposed facility and, further, that by delegating to the PSC the review and resolution of any outstanding contract issues, the Siting Board abrogated its independent duties in this regard.[4] We agree.

As we observed at the outset, Public Service Law former article VIII was designed to balance, in a single proceeding, the public's need for electricity and their environmental con-

Board's handling of this matter also violated State Administrative Procedure Act § 301 *(see generally, Matter of Cortlandt Nursing Home v Axelrod,* 66 NY2d 169, 177-178, *cert denied* 476 US 1115). Petitioners further contend that the Siting Board violated State Administrative Procedure Act § 303 by removing the ALJ who had presided over the initial hearings and replacing him with another ALJ. State Administrative Procedure Act § 303 provides, in relevant part, that "[w]henever a presiding officer is disqualified or it becomes impractical for him to continue the hearing, another presiding officer may be assigned to continue with the case unless it is shown that substantial prejudice to the party will result therefrom". Here, the proffered excuse for the ALJ's removal and replacement was his then-impending retirement. Petitioners recognize that this would indeed constitute an acceptable reason for removing/replacing an ALJ and, after reviewing the record before us, we are unable to conclude that petitioners were substantially prejudiced by the Siting Board's decision in this regard. Accordingly, under the circumstances present here, we are unable to conclude that there has been a violation of State Administrative Procedure Act § 303.

4. We note in passing that inasmuch as petitioners' challenges in this regard are based upon questions of pure statutory interpretation, dependent upon only the accurate apprehension of the Legislature's intent, there is no need for this Court to rely upon or defer to the Siting Board's particular expertise *(see generally, Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459).

cerns *(see,* L 1972, ch 385, § 1; L 1978, ch 708, § 1).[5] To that end, the statute requires the applicant to submit, *inter alia,* estimated cost information, i.e., a power sales contract, studies identifying the expected environmental impact of the proposed facility during both its construction and operation, and a statement explaining the need for the proposed facility *(see,* Public Service Law former § 142 [1] [a]-[f]; 16 NYCRR 815.2). Similarly, before the Siting Board may certify the proposed facility, it must "find and determine", *inter alia,* that there is a public need for the facility, that the facility represents the minimum adverse environmental impact considering, among other factors, the state of available technology and the nature and economics of any alternatives, and that the facility is in the public interest, in view of the environmental impact, the cost to society as a whole and the range of alternatives available *(see,* Public Service Law former § 146 [2] [a]-[g]).

As the foregoing provisions illustrate, Public Service Law former article VIII imposes upon the Siting Board very specific obligations, all aimed at ensuring that the Siting Board has before it and indeed considers the economic and environmental data necessary to render an informed decision. In our view, the absence of a valid power sales contract precluded the Siting Board from thoroughly and properly evaluating the economic impact of Inter-Power's proposed facility and, in turn, from discharging its statutory duty to weigh and balance project economics against the anticipated environmental impact.

We are similarly persuaded that the Siting Board's review under Public Service Law former article VIII is qualitatively and analytically distinct from the type of review performed by the PSC under the Public Utility Regulatory Policies Act of 1978 *(see,* 16 USC § 2601 *et seq.),* and we reject the notion that the Siting Board can fulfill its statutory obligation to evaluate project economics by having the PSC determine that the rates imposed by any revised power sales contract are "just and

5. In enacting the initial version of Public Service Law former article VIII, the Legislature recognized the competing economic and environmental forces at play and stated: "[I]t is essential to the public interest that meeting power demands and protecting the environment be regarded as equally important and that neither be subordinate to the other in any evaluation of the proposed construction of major steam electric generating facilities" (L 1972, ch 385, § 1). Although the Legislature acknowledged that there may be instances in which the public's need for electricity outweighs the competing environmental concerns, or vice versa, it is clear that economic and environmental factors were to be given equal consideration *(see, ibid.).*

reasonable". Respondents essentially take the position that because the PSC is responsible for ensuring that utilities purchase electricity from cogenerators at prices that are just and reasonable to the consumer and not more than the avoided costs for purchases *(see,* 18 CFR 292.304 [a]; *see also,* 16 USC § 824a-3), they may reasonably expect and/or conclude that the price set forth in any revised power sales contract "would be reduced to something similar to, if not the same as", the PSC's latest long-run avoided cost estimates.[6] Thus, the argument continues, if the contract price reflects the utility's avoided costs of generating power, it must be deemed "economic". Respondents' argument misses the mark, however. The mere fact that the PSC must ensure that the prices reflected in any revised power sales contract are just and reasonable to consumers does not absolve the Siting Board of its independent obligations under Public Service Law former article VIII. In other words, although the PSC's "just and reasonable" review may ultimately represent yet another hurdle for the applicant to clear, it cannot be deemed the functional equivalent of, and in our view was not intended to supplant, the Siting Board's review under Public Service Law former article VIII.[7]

Accordingly, we are of the view that the Siting Board failed to fulfill its duties under and comply with the mandates set forth in Public Service Law former article VIII and, as such, the conditional certificate issued by the Siting Board is invalid. In light of this conclusion, we need not address the remaining arguments advanced by petitioners, except to note that absent the required economic data, the Siting Board could not properly find and determine under Public Service Law former § 146 (2) (a) that there is a public need for the proposed facility.

---

**6.** Long-run avoided costs (hereinafter LRAC) are estimates made by the PSC as to the future cost of electricity that a utility, such as Niagara Mohawk, would have to pay if it generated the power itself as compared to purchasing the electricity from a developer, such as Inter-Power. It appears that the most recent LRAC estimates were made by the PSC in 1992.

**7.** Finally, petitioners challenge the Siting Board's failure to hold a hearing to address the project's economic aspects once it became apparent that Inter-Power no longer had a valid power sales contract with Niagara Mohawk. Inasmuch as the underlying factual issues were essentially uncontested, we see no need to disturb the Siting Board's determination in this regard, and we reject petitioners' assertion that the failure to hold a hearing under these circumstances violated Public Service Law former § 143 (2) and (3) and State Administrative Procedure Act § 301.

CARDONA, P. J., MERCURE, WHITE and WEISS, JJ., concur.

Adjudged that the determination is annulled, with costs, and petitions granted to the extent that the certificate of environmental compatibility and public need issued by respondent New York State Board on Electric Generation Siting and the Environment to respondent Inter-Power of New York, Inc. is revoked.